THE STATE OF OHIO, APPELLANT, *v.* COOPER, APPELLEE.

[Cite as *State v. Cooper,* 104 Ohio St.3d 293, 2004-Ohio-6553.]

(No. 2003–1637—Submitted September 29, 2004—Decided December 15, 2004.)

O'DONNELL, J.

{¶ 1} The issue for resolution in this appeal arises from the peculiar facts of this case in which the trial court held and the court of appeals agreed that based on our decision in *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, James A. Cooper's separate convictions for involuntary manslaughter and for child endangering constituted allied offenses of similar import and that, therefore, he could only be sentenced on the greater offense. The state contends that the trial court erred and seeks clarification of *Rance* and a reversal of the decision reached by the court of appeals.

{¶ 2} Here, we are called upon to revisit the allied-offense statute, R.C. 2941.25, and to clarify the law in the context of the facts of this case. After careful review, we have determined that the state presented evidence of two separate acts of child endangering—one involving slamming the infant's head against an object, as a predicate offense to the act of involuntary manslaughter, in violation of R.C. 2903.04, and the other involving shaking the infant, in violation of R.C. 2919.22. The jury returned verdicts finding Cooper guilty of involuntary manslaughter, involving one offense of child endangering, and a separate and distinct act of child endangering. Therefore, as explained below, we conclude that these acts are not the "same conduct * * * constitut[ing] two or more allied offenses of similar import" within the meaning of R.C. 2941.25(A) and, thus, do not involve analysis under *State v. Rance.*

{¶ 3} On February 22, 2001, Cooper telephoned for emergency assistance and reported that Jordan McElhatten, his 18–month–old stepson, had fallen down a flight of stairs at his home and was having difficulty breathing. When the ambulance crew arrived, they found only Cooper and Jordan in the home and transported both to the Galion Community Hospital.

{¶ 4} Upon assessment of Jordan's injuries in the emergency room, the medical team life-flighted Jordan to the MetroHealth Medical Center in Cleveland. There, Dr. Dennis Super, a pediatrician in the intensive-care unit, determined that Jordan had elevated intracranial pressure, or swelling of the brain. At trial, Dr. Super stated that Jordan had sustained one of the worst head injuries he had seen in his 18 years at that hospital and that the injuries were not, in his view, consistent with a fall down a padded flight of stairs. In his testimony, Dr. Super stated that the elevated intracranial pressure could have been caused by either a severe blow to the head or being shaken. Because of his suspicions, he consulted Dr. Thomas L. Steinemann, an ophthalmologist. Dr. Steinemann found "massive intraocular hemorrhage" in Jordan's right eye and "multiple areas of retinal hemorrhages" in the left eye and concluded that his findings were consistent with shaken-baby syndrome, rather than a fall down a flight of stairs.

{¶ 5} In determining how to alleviate the swelling in Jordan's brain, Dr. Judith Simon, a neuroradiologist, examined Jordan's CT scans. She testified that

injuries as severe as Jordan's were typically seen in victims of high speed automobile accidents or falls from great heights and would not be typical of a fall down a flight of stairs. The CT scans revealed that the entire right side of Jordan's brain swelled, indicating that he had sustained a serious blow to the right side of his head. Dr. Roseanna Lechner, a neurosurgeon, completed several surgical procedures, including removal of part of Jordan's skull to alleviate the pressure by giving the brain more room to swell.

{¶ 6} None of these efforts, however, proved successful, and as a result, doctors disconnected Jordan's life support. Cuyahoga County Deputy Coroner William Bligh–Glover performed an autopsy, which revealed that Jordan had bruises all over his body, but particularly on his face and head, which the coroner determined had been inflicted at the same time as the brain injuries.

{¶ 7} The coroner further testified that Jordan "had injuries to all the layers of the organs in the head," and he opined that Jordan's head and brain injuries could be attributed to either vigorous shaking or slamming the child against a hard surface. The autopsy report stated that Jordan died by homicide and noted the cause of death as "[b]lunt impacts to [the] head with soft tissue and brain injuries."

{¶ 8} Members of the Galion Police Department arrested Cooper, and the Crawford County Grand Jury returned a two-count indictment against him: the first for involuntary manslaughter with child endangering as the predicate felony offense and the second for child endangering in violation of R.C. 2919.22. The court conducted a jury trial, which resulted in convictions on both counts. Cooper argued that the two convictions constituted allied offenses of similar import under R.C. 2941.25. The trial court agreed and imposed sentence on only the conviction for involuntary manslaughter. Cooper appealed both convictions, and the state cross-appealed the trial court's ruling regarding allied offenses.

{¶ 9} The appellate court affirmed Cooper's convictions and, relying on *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699, upheld the trial court's allied-offense ruling. The state now appeals from that determination, arguing that involuntary manslaughter and child endangering are not allied offenses of similar import.

{¶ 10} The cause is now before this court upon our acceptance of a discretionary appeal.

{¶ 11} In *State v. Rance*, we held that the prohibition against cumulative punishments contained in *Blockburger v. United States* (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306, does not apply where the General Assembly clearly intended to impose cumulative punishment. *Rance*, at paragraph three of the syllabus. In determining legislative intent, we stated:

{¶ 12} "We discern the General Assembly's intent on this subject through review of Ohio's multiple-count statute, R.C. 2941.25. If the court's sentencing of Rance accords with the multiple-count statute, that harmony with the legislative intent precludes an 'unconstitutional' label. See *Albernaz* [*v. United States* (1981) ], 450 U.S. [333] at 344, 101 S.Ct. [1137] at 1145, 67 L.Ed.2d [275] at 285; [*State v.*] *Bickerstaff* [1984], 10 Ohio St.3d [62] at 65–66, 10 OBR [352] at 355–356, 461 N.E.2d [892] at 895–896. This court has stated that Ohio's multiple-count statute 'is a clear indication of the General Assembly's intent to permit cumulative sentencing for the commission of certain offenses.' *Id.* at 66, 10 OBR at 356, 461 N.E.2d at 896, fn. 1.

{¶ 13} "[I]f a defendant commits offenses of similar import separately or with a separate animus, he may be punished for both pursuant to R.C. 2941.25(B). *State v. Jones* (1997), 78 Ohio St.3d 12, 13–14, 676 N.E.2d 80, 81." *Rance,* 85 Ohio St.3d at 635–636, 710 N.E.2d 699.

{¶ 14} In this case, then, we look to R.C. 2941.25 to determine whether cumulative punishment is authorized. Ohio's multiple-count statute provides:

{¶ 15} "(A) Where the *same conduct* by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 16} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind *committed separately or with a separate animus* as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." (Emphasis added.)

{¶ 17} Accordingly, a court need only engage in the allied-offense analysis when the same conduct, or single act, results in multiple convictions. We emphasized that point in *State v. Logan* (1979), 60 Ohio St.2d 126, 128, 14 O.O.3d 373, 397 N.E.2d 1345: "In addition to the requirement of similar import of the crimes committed, the defendant, in order to obtain the protection of R.C. 2941.25(A), *must show that the prosecution has relied upon the same conduct to support both offenses charged.*" (Emphasis added.)

{¶ 18} We further elaborated in *State v. Jones* (1997), 78 Ohio St.3d 12, 14, 676 N.E.2d 80, where we stated:

{¶ 19} "This court has generally not found the presence or absence of any specific factors to be dispositive on the issue of whether crimes were committed separately or with a separate animus. * * * Instead, our approach has been to analyze the particular facts of each case before us to determine whether the acts or animus were separate. See *State v. Nicholas* (1993), 66 Ohio St.3d 431, 435,

613 N.E.2d 225, 229; *State v. Hill* (1992), 64 Ohio St.3d 313, 332, 595 N.E.2d 884, 899–900; *State v. Jells* (1990), 53 Ohio St.3d 22, 33, 559 N.E.2d 464, 475; *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 83–84, 549 N.E.2d 520, 522; *State v. Powell* (1990), 49 Ohio St.3d 255, 262, 552 N.E.2d 191, 199."[1]

{¶ 20} In *Logan*, we held that an offender must demonstrate the state's reliance on the same conduct to prove multiple charges before gaining the protection of R.C. 2941.25. Therefore, before we examine the facts of this case under R.C. 2941.25 and *Rance*, we must determine whether the state proved that Cooper committed two distinct acts of child endangering—one as a predicate for involuntary manslaughter, which resulted in Jordan's death, and a separate act which did not result in death. In our analysis, we necessarily review the evidence that the state presented in this regard at trial.

{¶ 21} At trial, the state presented evidence that Jordan had suffered several blunt impacts to the head and also exhibited signs of shaken-baby syndrome. The autopsy report noted that Jordan died as result of "[b]lunt impacts to [the] head with soft tissue and brain injuries." The autopsy report detailed two skull fractures, a bruise on the left forehead, another bruise below the chin, an abrasion on the right forehead, a bruise on the right cheek, another bruise on the right forehead, and one bruise under the scalp, between the scalp and skull. These injuries culminated in the coroner's conclusion that Jordan sustained blunt trauma to the head, causing his death by homicide.

{¶ 22} At trial, Jordan's mother, Patricia McElhatten, testified that Jordan had no bruises on his chin or neck when she last saw him on February 22, 2001.

{¶ 23} Also, Dr. Bligh–Glover, the deputy coroner, testified extensively regarding the injuries inflicted upon Jordan. He opined that Jordan had both coup and contrecoup contusions over many surfaces of his brain. The doctor explained that coup contusions appear on the brain directly under the point of impact when there is a direct blow to the head. Contrecoup contusions, however, occur on the side of the brain directly opposite of the point of impact because the brain is suspended in fluid and will press up against the opposite side of the skull before moving back to the side where the impact occurred. Dr. Bligh–Glover explained how the injuries to Jordan's brain could have occurred:

{¶ 24} "The type of injuries that I saw on Jordan could have occurred in two ways. The first part is the shaking of the shaken baby syndrome. When you shake a kid very vigorously—and kids' heads, as I said, are heavy. Their necks are weak. And the head bounces back and forth and gives this acceleration/deceleration in the skull.

---

1. We note that *Rance* overruled *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, on other grounds. 85 Ohio St.3d at 638, 710 N.E.2d 699.

{¶ 25} "Then, finally, there is the impact phase. When the shaking is finished, the baby is limp and unconscious and lands against a hard surface."

{¶ 26} Further, Dr. Steinemann, an ophthalmologist, examined Jordan and, based on the massive intraocular hemorrhage in the right eye and the multiple areas of retinal hemorrhages in the left eye, found that these injuries were "consistent with shaken baby syndrome." And Dr. Bligh–Glover testified that "retinal hemorrhaging in the pattern that [he] saw in Jordan McElhatten, throughout the back of the retina, is considered to be pathognomonic, proof positive, of shaken impact syndrome."

{¶ 27} The state claimed in its opening statement and presented evidence at trial that Cooper had committed two acts of violence against Jordan—slamming his head against a hard surface and shaking him. The state offered separate medical testimony as to each act. Dr. Bligh–Glover's testimony and the autopsy report proved that Cooper caused Jordan's death by either striking him or slamming him against a hard object. The testimony offered by Doctors Super, Steinemann, and Bligh–Glover proved that Cooper endangered Jordan's life by vigorously shaking him.

{¶ 28} Based on the foregoing, the record reflects that the state presented evidence at trial demonstrating that Cooper committed two separate acts, slamming Jordan against a hard surface and shaking him; accordingly, the state did not rely on the same conduct to prove two offenses. Additionally, the court instructed the jury to consider the evidence pertaining to each count separately. The jurors returned verdicts finding Cooper guilty of both offenses.

{¶ 29} Here, Cooper's convictions did not originate from a single act, but rather, in accordance with the evidence, from his separate acts of slamming Jordan against a hard surface, which provided the basis of the underlying offense of child endangering in connection with the involuntary manslaughter conviction, and shaking Jordan, as a separate count of child endangering. Our decision does not alter our holding in *Rance,* because *Rance* is not implicated by the facts of this case.

{¶ 30} Therefore, we hold that R.C. 2941.25(A) applies when the state obtains multiple convictions arising out of the same conduct of a defendant that can be construed to constitute two or more allied offenses of similar import. Where the state has not relied upon the same conduct of the defendant to support a conviction for the offense of involuntary manslaughter involving child endangering and a separate conviction for child endangering, the defendant may be convicted of both crimes and sentenced on each.

{¶ 31} The judgment of the appellate court is reversed, and this cause is remanded for further proceedings in accordance with our opinion.

Judgment accordingly.

RESNICK, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

MOYER, C.J., dissents.

F.E. SWEENEY and PFEIFER, JJ., dissent and would dismiss the appeal as improvidently allowed.

———————

Stanley Flegm, Crawford County Prosecuting Attorney, and Clifford Murphy, Assistant Prosecuting Attorney, for appellant.

John Spiegel, for appellee.